J-S04028-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: F.H., Z.H. (MINOR CHILDREN) | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | No. 1116 WDA 2015 |

Appeal from the Orders entered on June 26, 2015
in the Court of Common Pleas of Washington County,
Orphans' Court Division, No(s): 63-15-0241; 63-15-0242

BEFORE:  BOWES, OLSON, and STRASSBURGER,[*] JJ.

MEMORANDUM BY OLSON, J.:                    **FILED FEBRUARY 05, 2016**

M.H. ("Father") appeals from the orders[1] dated June 25, 2015, and

entered on June 26, 2015, granting the petitions filed by the Washington

County Children and Youth Social Service Agency ("CYS" or the "Agency") to

involuntarily terminate his parental rights to his dependent, special needs

children, F.H., a female born in September of 2003, and Z.H., a male born in

---

[*] Retired Senior Judge specially assigned to the Superior Court.

[1] On November 16, 2015, this Court, acting *sua sponte*, dismissed Father's appeal at Docket No. 1117 WDA 2015 as duplicative, and preserved the right for him to assert issues properly raised at that docket number in the present appeal.

September of 2005 (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2] We affirm.

The trial court set forth the relevant history of this case in its opinion. *See* Trial Court Opinion, 8/26/15, at 1-14. We adopt the trial court's recitation for purposes of this appeal. *See id*.

On July 20, 2015, Father timely filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In his brief on appeal, Father raises two questions for this Court's review, as follows:

> I. Whether the trial court improperly terminated Father's parental rights where [F]ather was compliant with the court-ordered services but was unable to obtain employment or housing that was outside of his control pursuant to § 2511(b)[?]
>
> II. Whether the trial court improperly terminated Father's parental rights where testimony indicated that [F]ather had a close bond with the [C]hild[ren] and that severing the bond would have a detrimental effect on the [] [C]hildren[?]

Father's Brief at 6.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the

_____

[2] C.K., the natural mother of the Children, ("Mother"), died in June of 2011. N.T., 6/25/15, at 12.

- 2 -

findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to

- 3 -

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** *quoting* ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court terminated Father's parental rights under sections 2511(a)(1), (2), (5), (8), and (b). ***See*** Trial Court Opinion, at 9/2/15, at 1. Sections 2511(a)(1), (2), (5), (8), and (b) provide as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of

time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but, under section 2511(b), the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

We could find that Father waived any challenge to the trial court's findings as to section 2511(a) and the subsections thereof by failing to

challenge specifically that section in his concise statement and brief. *See*

***Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797

(Pa. Super. 2006) (holding that an appellant waives issues that are not

raised in both his or her concise statement of errors complained of on appeal

and the Statement of Questions Involved in his or her brief on appeal).

However, given the broad language used by Appellant in his concise

statement and brief and, under an abundance of caution, we will review the

trial court's holdings under section 2511(a). We will focus on subsection

2511(a)(2), and adopt the trial court's discussion in its opinion as this

Court's own.[3] *See* Trial Court Opinion, 8/26/15, at 15-20.

The Supreme Court set forth our inquiry under section 2511(a)(2) as

follows:

> [Section] 2511(a)(2) provides [the] statutory ground[] for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> [The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> > A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The

---

[3] We note that the trial court relied on its discussion of the facts in relation to section 2511(a)(1) to support its analysis under section 2511(a)(2).

> legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting* *In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 616 Pa. at 326-327, 47 A.3d at 827.

This Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

The trial court assessed the evidence regarding Father's repeated incapacity to parent the Children, and his inability to remedy the conditions and causes of his incapacity to parent the Children, at length, which we adopt herein. *See* Trial Court Opinion, 9/2/15, at 9-12.

The trial court found that the repeated and continued incapacity, abuse, neglect or refusal of Father has caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Father. *See* Trial Court Opinion, 8/26/15, at 19.

- 7 -

Father contends that the trial court abused its discretion and erred as a matter of law in terminating his parental rights when CYS failed to provide him with reasonable efforts to promote reunification between him and the Children prior to filing the termination petitions. Father's Brief, at 9-10. Specifically, Father complains that he lacked employment, despite applying for jobs, and that he lacked housing and a vehicle, until his mother, ("Paternal Grandmother"), gave him a vehicle at the time of the termination hearing. Father asserts that CYS did not contact Paternal Grandmother to inquire whether she would move back with Father when he obtained housing or independently become a placement resource for the Children. *Id.* at 10. Father states that Paternal Grandmother later moved to the Poconos to care for an elderly friend. He complains that CYS never contacted her as a placement resource for the Children, despite Father's request to consider her.

Our Supreme Court held, however, that the trial court is not required to consider reasonable efforts in relation to a decision to terminate parental rights under section 2511(a)(2). *In the Interest of: D.C.D.*, ___ Pa. ___, ___, 105 A.3d 662, 675 (2014). Thus, we find his argument lacks merit.

The facts, as found by the trial court, nevertheless, support the conclusion that CYS made reasonable efforts to reunify the Children with Father, and Father failed to make sufficient progress with the services offered to him. The trial court stated:

- 8 -

[T]he [C]hildren were placed in foster care in 2011 due to the parents' drug use as well as their failure to provide appropriate medical care and safe and appropriate housing for the [C]hildren. Again in 2014, the [C]hildren were placed in foster care because [Father] failed to comply with his own treatment, failed to provide appropriate medical care, and failed to provide [a] safe and appropriate home for the [C]hildren. For the past thirteen (13) months [Father] proved unable to remedy these circumstances. Furthermore, he did not consistently comply with his own services while the [C]hildren were in placement. For these and all of the above reasons, the [c]ourt found that the Agency met its burden by clear and convincing evidence that grounds for termination under Subsection [2511] (a)(2) existed.

Trial Court Opinion, 8/26/15, at 19-21.

Although a reasonable efforts inquiry is not an element to a termination decision under section 2511(a)(2), our review of the record shows that there is ample evidence to support a determination that CYS made reasonable efforts, yet Father failed to make sufficient progress with the services provided to successfully be capable of parenting the Children. As the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's orders with regard to subsection 2511(a)(2). **In re Adoption of S.P.**, 616 Pa. at 325-26, 47 A.3d at 826-27.

Next, we review the termination of Father's parental rights under section 2511(b). Our Supreme Court recently stated as follows.

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as

> love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

Father asserts that there was no expert testimony regarding the bond between the Children and him, and no evidence of a true bonding assessment. He also asserts that the evidence presented at the hearing indicated that there is a close bond between the Children and him. Father's Brief at 14. For these reasons, Father claims the trial court failed to properly conduct its bond analysis under section 2511(b). *Id.*

We have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has also observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). It is appropriate to consider a child's bond with his or her foster parent. *See In re: T.S.M.*, 620 Pa. at 629-630, 71 A.3d at 268.

In addition, in *In re: T.S.M.*, our Supreme Court set forth the process for evaluating the existing bond between a parent and a child, and the

necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home. The Supreme Court stated the following:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. **See, e.g., R.J.T.**, [9 A.3d 1179, 1190 (Pa. 2010)] (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.
>
> [The Adoption and Safe Families Act of 1997, P.L. 105-89] ASFA[,] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. **See In re R.J.T.**, 9 A.3d at 1186; **In re Adoption of S.E.G.**, [901 A.2d 1017, 1019 (Pa. 2006)]. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. **See**, 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency

has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

*In re: T.S.M.*, 620 Pa. at 631-632, 71 A.3d at 268-269.

In the present matter, the trial court considered the needs and welfare of the Children, and set forth its bond-effect analysis. The trial court also provided an explanation of why its termination decision was not based on matters that were outside of Father's control. We adopt the trial court's discussion herein. **See** Trial Court Opinion, 8/26/15, at 21-26. The trial court properly considered the best interests of the Children in rendering its decision that, although there was evidence of a bond between the Children and Father, it was in their best interests to sever that bond. **See id.**; **In re: T.S.M.**, 620 Pa. at 631-632, 71 A.3d at 268-269.

Father testified that he loves the Children very much. N.T., 6/25/15, at 121. As we stated in **In re Z.P.**, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." **Id.** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." **In re B., N.M.**, 856 A.2d 847, 856 (Pa. Super. 2004). Again, as the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard to

section 2511(b).  ***In re Adoption of S.P.***, 616 Pa. at 325-26, 47 A.3d at 826-27.

Accordingly, we affirm the trial court's orders terminating Father's parental rights.  As we have adopted portions of the trial court's opinion as our own, the parties are directed to attach a copy of the trial court's opinion of August 26, 2015 to any future filings with this Court.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/5/2016

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

ORPHANS' COURT DIVISION

- - -

In re: Adoption of

Z.H.
F.H.,

Minor children.
Appeal of M.H., Father

OC-63-15-241
OC-63-15-242
1116 WDA 2015
1117 WDA 2015

## **OPINION**

The Court provides its opinion pursuant to Pa. R.A.P. 1925(A)(2)(ii).

Appellant M.H., Father, claims that the Court erred when it ordered his parental

rights terminated. Father contends that despite his compliance with court ordered

services he faced environmental challenges including the lack of employment and

stable housing. Father asserts that his close bond with his children should not have

been severed because of the detrimental effect such termination will have on the

minor children.

## **Procedural History**

On March 21, 2011, the Washington County Children & Youth Services

Agency ("The Agency") filed a petition with the Court to adjudicate F.H. (D.O.B.

9/10/03) and Z.H. (D.O.B. 9/11/05) dependent children pursuant to 42 Pa. C.S.A. §

6391(1) and (5).

## I. Adjudication

The Honorable John F. DiSalle scheduled an adjudicatory hearing for March 29, 2011 at 3:45 p.m. before Juvenile Hearing Office Dennis R. Paluso. At the first scheduled hearing Mother C.K. requested a continuance in order to acquire private counsel. Mr. Paluso granted this request and recommended to the court that a new hearing be set. On April 1, 2011, the Agency presented an Emergency Shelter Petition that was granted by Judge DiSalle. Judge DiSalle ordered the children temporarily placed pending a shelter care hearing. He also appointed legal counsel for C.K., and scheduled the shelter care hearing for April 5, 2011 before Mr. Paluso.[1]

On April 5, 2011, Mr. Paluso held the emergency shelter hearing. Both parties appeared represented by counsel. By agreement of the parties, the shelter care hearing was converted into an adjudicatory and disposition hearing. At the hearing, the parties stipulated to finding both Z.H. and F.H. to be dependent children pursuant to 42 Pa. C.S.A. 6302 (1).

Mr. Paluso's findings indicated the Agency had been involved with the family since September of 2010. The Agency alleged that M.H. was abusing

---

[1] Prior to the March 29 hearing the children were temporarily placed in foster care pursuant to a voluntary placement agreement between the Agency and the parents. The voluntary placement agreement was set to expire before a rescheduled adjudicatory hearing could be heard.

2

prescription drugs and methadone and that C.K., who was also abusing drugs, had left the home in July of 2010 only to return in February 2011. The family had been unsuccessfully discharged from Justice Works Youth Care in-home services and in-home Homemaker Services in the fall of 2010. The children's' school nurse had complained that the children appeared malnourished and filthy in school. Following the referral, the Agency caseworker went to the home to speak with M.H., after which M.H. reportedly left the home with the children and broke contact with the Agency. The Agency located M.H. outside a methadone clinic approximately one month later. M.H. permitted the caseworker to see the children, whom he was keeping in a hotel room, and at that time signed a voluntary placement agreement. The caseworker referred the parents to the Justice Works Parenting Education program, but again, the parents did not successfully follow through with participating in the program.

F.H. suffers from holoprosencephaly-based cerebral palsy, a cephalic/cranial birth defect that causes developmental delays and significant motor dysfunction. She is wheelchair-bound, has required in-home nursing care, and is learning to speak. At the time of the hearing, her parents had failed to seek medical treatment to assist or mitigate her illness. At the time of the adjudicatory hearing, Z.H. had an untreated eye condition. In March 2011, M.H. tested positive for benzodiazepine, an anti-anxiety medication for which he lacked a prescription. M.H. admitted to

3

purchasing this drug illegally. At the same time, C.K. participated in drug testing and tested positive for benzodiazepine and opiates. At that time, she had a prescription for Vicodin and Xanax. At the time of the drug test, C.K. showed empty bottles of both to the agency caseworker, and she admitted that she had sold her medication.

As of the hearing, Z.H. had missed twenty four (24) days of preschool since November 12, 2010 and F.H. had missed eighty-eight (88) days of school for that school year.

As part of Mr. Paluso's Adjudication and Disposition Order, he ordered M.H. and C.K. to each submit to random drug and alcohol testing, participate in drug and alcohol evaluations, mental health evaluations, and a Justice Works Youth Care Nurturing Parenting Program. He further ordered M.H. and C.K. to maintain safe and appropriate housing. Both parents were granted supervised visitation two (2) hours every other week.

## II. Permanency Hearings

C.K. died unexpectedly on June 7, 2011. Mr. Paluso held the initial permanency review hearing on July 5, 2011. Since that time, M.H. had begun and followed through on some of his ordered services, including gaining prescriptions for his medication and attending parenting education classes. At the time of the

4

hearing, the permanency plan's primary goal was to return the children to their parents, with a concurrent plan of adoption.

Mr. Paluso held further permanency review hearings on October 4, 2011, January 3, 2012, March 6, 2012, April 3, 2012, May 1, 2012, and June 12, 2012. The case was then transferred to Juvenile Hearing Officer Jessica Roberts, who held permanency review hearings on October 12, 2011, January 11, 2013, March 8, 2013, June 7, 2013, January 27, 2014[2], April 4, 2014, August 4, 2014, September 8, 2014, November 3, 2014, January 5, 2015, March 9, 2015, and June 8, 2015. A total of eighteen (18) permanency review hearings were conducted.

## III. Placement

Z.H. and F.H. were placed in Agency foster care after the April 5, 2011 adjudicatory/shelter hearing. They remained in placement for approximately one year and one month, until they were returned home to M.H. on May 11, 2012 when the Court granted a consented-to motion presented by the Agency. They remained home with M.H., who received in-home services, until January 31, 2014.

Following the January 27, 2014 permanency review hearing, the children were placed first in kinship care and then in foster care because M.H. had become unable to meet the physical and medical needs of both children and because he was

---

[2] A review hearing was set for December 9, 2013. However, F.H. required hip surgery in December. On November 26, 2013, the Agency, with consent of M.H., requested a continuance in order to provide F.H. time to recuperate. The Honorable Katherine Emery granted this motion. The review hearing was pushed to January 27, 2014.

5

facing eviction from his residence. The children remained in foster care placement until the termination proceeding, having moved between several placement providers due to their special treatment needs. Compliance with court ordered services and the degree to which progress in alleviating the circumstances necessitating placement greatly influenced these placement decisions.

## IV.   Compliance and Progress

As of the initial permanency review hearing on July 5, 2011, M.H. had been moderately compliant with the permanency plan but had made little progress towards alleviating the circumstances that had necessitated the original placement. He had begun medication management and had undergone an intake appointment for his mental health assessment but not followed up. He had a significant amount of missing prescription medication. He had been inconsistent with attending parenting education and the children's doctor appointments, but he began consistently attending parenting education after C.K.'s death.

By the second permanency review hearing in October 2011, M.H. was moderately compliant, participating in services, displaying a sanitary home, and attending his mental health assessment, but was still missing medication.

By the third permanency review hearing on January 3, 2012, M.H.'s progress and compliance had improved. He was attending almost all visitations and doctors' appointments for the children. He had been successfully discharged from

6

several services and was taking part in drug and mental health treatment. At each successive permanency review hearing, his visitation was increased. At the March 3, 2012 permanency review hearing, behavioral problems in Z.H. required further services in the home of his foster parents.

On March 30, 2012, the Agency presented an emergency motion to the Honorable Paul Pozonsky to move the children from one foster care placement to another. The Agency's motion stated an original intent to return the children home at that time, but due to a disagreement with the Guardian ad Litem requested transfer to a different placement provider. Judge Pozonsky granted the motion. The March and April 2012 permanency review hearings primarily concerned Z.H., who was showing significant behavioral problems in his foster home. At both hearings, M.H. was noted to be fully complying and making significant progress: He was participating in medication management treatment, regularly attending methadone treatment with notably good progress, attending the children's medical appointments, keeping a clean and appropriate home, utilizing the parenting skills taught by his previously discharged parenting education services, and attending increased visitation. At that time, the Washington Communities Mental Health program indicated they would advance M.H. to blended case management services upon the return of the children to his home. M.H. was permitted overnight visitation with the children.

7

At the March and April hearings, the issue of Z.H.'s compliance and progress held back reunification. He had been displaying serious behavior problems in his foster homes: in addition to verbal threats and physical aggression directed towards his foster mother, Z.H. had to be restrained in a helmet to prevent head injuries when he would repeatedly bang his head into walls. A psychological evaluation recommended Clonodine and Atomoxetine, both medications commonly used to treat Attention Deficit Hyperactivity Disorder ("ADHD"), as well as wrap-around services to include twenty (20) hours per week of therapeutic staff support, two (2) hours per week of mobile therapy, and four (4) hours per week with a behavioral specialist. The recommended services with the behavioral specialist were to be reduced to four (4) hours after the first month, and then Z.H. was recommended to be further evaluated after six (6) weeks to determine if he had a diagnosis on the autism spectrum.

At the May 1, 2012 permanency review, Mr. Paluso indicated that upon Z.H.'s acceptance by Pressley Ridge for Family Based Therapy, the children could return home to M.H. by way of motion. The children were returned on May 11, 2015 after the Honorable John F. DiSalle granted the Agency's motion to return the children to M.H.'s home.

The July 10, 2012, October 12, 2012, and January 11, 2013 permanency review hearings indicated improving outcomes: in addition to M.H.'s continued

full compliance and significant progress, Z.H. was responding well to his treatment and the family had begun taking part in blended case management services. F.H.'s pediatrician prescribed in-home nursing services to assist M.H. in caring full-time for F.H. which began between the July and October hearings. Juvenile Hearing Officer Jessica Roberts took over the case for Mr. Paluso on October 12, 2012.

At the March 8, 2013 permanency review hearing, Mrs. Roberts noted that recently provided in-home service providers had resulted in "a great deal of improvement" in the home. However, the children's truancy began to be a notable problem, with F.H. missing thirteen (13) of the previous thirty eight (38) days of school. The June 7, 2013 permanency review hearing similarly indicated compliance on M.H.'s part and significant progress, indicating that while Z.H. and F.H. had missed increasing amounts of school days, M.H. was handling Z.H.'s refusal to attend school in an improved and appropriate manner.

A review hearing was set for December 9, 2013. However, F.H. required hip surgery in December. On November 26, 2013, the Agency, with consent of M.H., requested a continuance in order to provide F.H. time to recuperate. The Honorable Katherine Emery granted this motion. The review hearing was pushed to January 27, 2014.

At the January 27, 2014 hearing, the trajectory of the case changed significantly. While M.H. had continued to participate in his medication

9

management and methadone treatment, he had failed to keep the children up to date on their medical appointments and was no longer consistently attending mental health therapy. Try-Again Homes terminated the in-home Family Preservation services due to M.H.'s noncompliance. F.H.'s home nurse had been reassigned to a different home and was not replaced by the service provider. M.H.'s insurance company, before terminating his insurance, refused to cover the cost of an in-home nurse for F.H. following her surgery. M.H. was also inconsistent in ensuring F.H.'s follow-up care. She missed follow-up appointments at a nutrition clinic and with her pediatrician. Z.H.'s absences had increased to thirty (30) for the school year, and M.H. did not keep a mental health assessment appointment for Z.H.

Furthermore, Mrs. Roberts indicated that it was an issue at the hearing whether or not the home had sufficient food for the children and whether or not the home continued to be a clean, safe, and appropriate environment for the children. M.H. had sufficient income to afford his rent at that time. See H.T. 53, ln. 3, H.T 78, ln. 23. However, he was delinquent on several months' rent by January of 2014. See H.T. 46 ln. 4. M.H. admitted that he was to be evicted on January 31, 2014. His apartment was provided to him fully furnished. See H.T. 53, ln. 9. Much of this furniture was missing at the time of his eviction. H.T. 53, ln. 14. M.H. procured some additional replacement furniture without contacting the Agency

providers that assisted him in originally furnishing the apartment. See H.T. 53, 54. Instead, he rented furniture through Rent-A-Center. See H.T. 104, 105. He explained at the termination proceeding that this was due to F.H. being sick and ruining the existing furniture. **Id.** The Court did not find this explanation credible. See H.T. 80.

Due to the convergence of issues, M.H. asked the court to place the children at that time. See Termination Hearing Transcript, pages 109, 132.

Mrs. Roberts ordered the children to be placed in kinship care with Patty Papa, on January 30, 2014. After the hearing, the Agency discovered that Ms. Papa could not take the children and requested via emergency motion to place the children in foster care. The Court granted this motion on January 30, 2014. The Agency requested joint signatory rights on February 27, 2014 in the event that M.H. could not be located to provide consent for the children's medical care. The Court granted this motion.

M.H.'s compliance and progress did not recover to the levels that existed in 2013. At the next permanency review hearing, on May 5, 2014, Mrs. Roberts found M.H.'s compliance and progress to be minimal. He had been attending the children's medical appointments and continuing with his methadone treatment, but had only attended 6 of the previous twelve (12) mental health treatment sessions.

He had not yet secured safe and appropriate housing. He was no longer communicating with his blended case manager.

M.H.'s compliance and progress did not increase at the August 4, September 8, and November 3, 2014 permanency review hearings. He was not able to procure safe and appropriate housing and he continued to be inconsistent in both drug and mental health treatment. He began visiting the children less regularly.

At the January 5, 2015, Mrs. Roberts found M.H. to have moderately complied with the permanency plan, by re-engaging in his services and treatment. However, he had not managed to procure housing and had no family members willing or able to assist in caring for the children's needs. As such, his progress remained minimal.

The Agency filed a petition to involuntarily terminate M.H.'s parental rights on February 25, 2015.

At the March 9, 2015 Permanency Review hearing, Mrs. Roberts found M.H.'s compliance and progress to be minimal. M.H.'s blended case manager indicated that he had not seen M.H. in a considerable amount of time, and he remained unemployed and without housing. He had not been regularly visiting the children, particularly F.H.

At the June 8, 2015 permanency hearing, Mrs. Roberts again found M.H.'s compliance and progress to be minimal, again through minimal and inconsistent

mental health treatment and visitation. She wrote "The Master believes that [M.H.] has a strong desire to be reunited with his children and love for his children; however, he puts forth minimal effort in obtaining reunification."

## Standard of Review

In an appeal from an order terminating parental rights, "[the Superior Court is] limited to determining whether the decision of the trial court is supported by competent evidence." *In the Interest of S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005), appeal denied, 586 Pa. 751, 892 A.2d 824 (2005) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000)). "We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence." *In re M.G.*, 855 A.2d 68, 73 (Pa. Super. 2004) (quoting *In re Diaz*, 447 Pa. Super. 327, 669 A.2d 372, 375 (1995)). The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. Id. at 73–74; *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002). In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. *In re M.G.*, 855 A.2d at 73–74. When the trial court's findings are supported by competent evidence of record, we will affirm "even if the record could also support an opposite result." *In the Interest of*

13

*S.H.*, 879 A.2d at 806. Absent an abuse of discretion, an error of law, or insufficient evidentiary support, the trial court's termination order must stand. *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa. Super. 2005).

## Termination

The Agency filed its petition to Terminate M.H.'s parental rights on February 25, 2015. The Court originally scheduled the proceeding for May 13, 2015, but rescheduled the proceeding to May 6, 2015. On May 6, 2015, the Court rescheduled the proceeding for June 25, 2015, to provide M.H. an opportunity to participate in Termination of Parental Rights consultation services.

The Court held the termination of parental rights proceeding on June 25, 2015.

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children. A parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated. *In re. K.Z.S.*, 946 A.2d 753 (Pa. Super. 2003), citing *In re B.L.L*, 787 A.2d 1007 (Pa. Super. 2001).

The Agency requested the Court to terminate M.H.'s parental rights pursuant to Subsections 1, 2, 5, and 8 of chapter 2511 of the Adoption Act, enumerated below:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8).

Pennsylvania appellate courts have observed that there is no simple or easy definition of parental duties. Parental duty is best understood in relation to the

needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. A parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. *In re J.T.*, 983 A.2d 771 (Pa. Super. 2009), citing *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977).

Pursuant to Subsection (a)(1), the Court must determine if the Agency established by clear and convincing evidence that for at least the six months prior to the filing of the termination petition, M.H. failed to perform his parental duty or evidenced a settled purpose to relinquish his parental rights. § 2511(a)(1), see also *In re Adoption of R.J.S.*, 901 A.2d 502 (Pa. Super. 2006). Furthermore, in examining the parent's conduct, the court must look not only to the six (6) months before the petition but also examine the totality of the circumstances of the case, including the parent's explanation and overall circumstances. *In re B., N.M.*, 856 A.2d 847 (Pa. Super. 2004), citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999).

M.H. has a clear commitment and love for his children, but the record indicated that M.H. did not have a commitment to reunification. [The Superior Court has] held that a parent's own feelings of love and affection for a child, alone,

16

do not prevent termination of parental rights. *In re T.M.T.*, 64 A.3d 1119 (Pa. Super. 2013), citing *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). Z.H. and F.H. have spent only twenty-one (21) of the preceding fifty (50) months in M.H.'s care. The children were in foster care placement for the six months preceding the filing of the petition.

Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. *In re B., N.M.*, 856 A.2d 847, 855, citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999). A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *In re B., N.M.*, 856 A.2d at 855, citing *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003).

The children were placed into foster care in 2011 due to M.H. and C.K.'s drug abuse, unsafe and inappropriate home environment, and inability to meet the children's needs. Since the second placement of the children in January of 2014, M.H. made little to no progress in alleviating similar circumstances. He did not regularly participate in all of his drug or mental health treatment, he failed to regularly attend doctor's appointments and visitation, and he could not procure

17

employment or safe and appropriate housing necessary to meet the children's needs.

M.H. admitted his own concerns with his ability to care for Z.H. and F.H. during a hearing before Mrs. Roberts in August of 2014. H.T. 28, ln. 19, H.T. 109, ln. 13. Furthermore, M.H. testified that he had applied for approximately "40 plus" or "50" jobs. See H.T. 114. He did not elaborate on what jobs he had applied for or where he had done so. The Court did not find this testimony credible.

This is not a case where the children were simply returned home to M.H. with no services or support. The Agency did not seek termination because M.H. lacked the financial resources to care for the children. Significant resources were expended to provide M.H. in-home care so that he could provide for F.H. and Z.H.'s special needs. He gained his housing with assistance from the Agency. He was provided furniture. Z.H. had multiple service providers and F.H. had in-home nursing care. Ultimately, M.H. did not comply with his drug or mental health treatment, he did not ensure his children received all necessary medical care, and he did not maintain a safe and appropriate home for the children. These circumstances were entirely within his control. For these reasons, the Court found that the Agency met its burden by clear and convincing evidence to prove that grounds existed for termination pursuant to Subsection (a)(1).

Pursuant to Subsection (a)(2), the Court must determine that 1) M.H.'s lack of parenting ability (the repeated and continued incapacity, abuse, neglect, or refusal of the parent) caused the children to be without essential parental care and control, 2) that the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by M.H.

"[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817 (Pa. 2012), citing *Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 891 (Pa. 1986). As discussed above, the children were placed in foster care in 2011 due to the parents' drug use as well as their failure to provide appropriate medical care and safe and appropriate housing for the children. Again in 2014, the children were placed in foster care because M.H. failed to comply with his own treatment, failed to provide appropriate medical care, and failed to provide safe and appropriate home for the children. For the past thirteen (13) months M.H. proved unable to remedy these circumstances. Furthermore, he did not consistently comply with his own services while the children were in placement. For these and all of the above reasons, the Court found that the Agency met its burden by clear and convincing evidence that grounds for termination under Subsection (a)(2) existed.

Pursuant to Subsection (a)(5), the court must determine if 1) the conditions that led to the removal or placement of the children continue to exist after the passage of six (6) months, 2) M.H. cannot or will not remedy those conditions within a reasonable period of time, and 3) the services that are available to the parents are not likely to remedy the conditions that led to removal.

As set forth above, the Court found that the conditions that led to the placement of F.H. and Z.H. continued to exist and that M.H. failed to remedy these conditions since placement. The services made available to M.H. have not remedied these conditions and are not likely to do so. M.H. has been in uninterrupted Methadone treatment for approximately seven and a half years. See H.T. 31, 34. Testimony at the hearing indicated that his medical providers recommended indefinite Methadone treatment. See H.T. 41. The conditions that led to placement in 2014 were similar to those that led to placement in 2011. This relapse indicates that despite his genuine intent to alleviate the circumstances that necessitated placement, he is unable to correct these problems in a timely fashion. Four years and three months is simply too long a period of time for Z.H. and F.H. to wait.

Finally, pursuant to Subsection (a)(8), the Court must determine if 1) the conditions that led to the removal or placement of the children continue to exist after the passage of twelve (12) months. Once the 12-month period has been

established, the court must next determine whether the conditions that led to the children's removal continue to exist, despite the reasonable good faith efforts of [the Agency] supplied over a realistic time period. *In re T.M.T.*, 64 A.3d 1119 (Pa. Super. 2013), quoting *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

As of the filing of the petition, thirteen months had elapsed from the placement of the children. The Court notes that while there have been varying findings of minimal and moderate compliance since January 2014, such findings are not as important as the findings on progress. A case may readily exist where a party is minimally compliant but makes progress in alleviating the circumstances. However, M.H. has made only minimal progress since January of 2014. For this, and for all of the above mentioned reasons, the conditions that led to placement continue to exist. It is on this basis the Court found that the Agency met its burden under Subsection (a)(8).

In addition to establishing one of the enumerated grounds for termination, the Court must also determine by clear and convincing evidence that termination of parental rights best meets the needs and welfare of the children. 23 Pa. C.S.A. § 2511(b). The law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251 (Pa. 2013), citing *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179 (Pa. 2010).

21

In determining if termination best meets the needs of the children, the Court must examine the nature and strength of the parent-child bond and the effect of the severance of that bond. *In re C.M.S.*, 884 A.2d 1284 (Pa. Super. 2005).

Attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. *In re T.S.M.*, 71 A.3d at 269.

In the present case, the children have not yet formed a bond with their foster care placement providers and are not in a potentially permanent pre-adoptive placement. However, the best interests of the children do not require the Court to find in favor of an existing but unhealthy bond in this circumstance. A panel of the Superior Court recently held:

> [There] was no evidence presented during the hearing that Child is bonded with his current foster family. Further, there was no testimony as to whether or not Child's current foster placement is pre-adoptive. However, these concerns are outweighed in the instant case by Mother's repeated failure to remedy her parental incapacity, and by Child's need for permanence and stability. See *In re T.D.*, 949 A.2d 910, 920-23 (Pa Super. 2008); *In re Adoption of J.M.*, 991 A.2d 321, 325 (Pa. Super. 2010), quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003) ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.")

22

*In re Adoption of C.D.R.*, 2015 PA Super 54, 111 A.3d 1212, 1220 (Pa. Super. 2015)

The Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Both F.H. and Z.H. are special needs children. Z.H. is diagnosed with A.D.H.D., an autism spectrum disorder, and nystagmus. He has been undergoing treatment since 2012 with a variety of therapies and medications. See H.T. 61, 62. F.H. has cerebral palsy and has been diagnosed with a "failure to thrive" condition. She requires in-home care, handicap accessible housing, an enhanced diet, and several medications. See H.T. 59, 60. M.H.'s inability to provide the children with even the minimum of parental care underscores their need for permanence.

M.H. testified that he loved his children and that they loved him. The evidence on the matter of the strong emotional bond between M.H. and his children was essentially undisputed. But M.H. proved over the past several years that even with extensive assistance, he struggled and failed to meet their needs. Given their needs and welfare, preserving this bond will only serve to harm the best interests of Z.H. and F.H. The Court could not, out of an effort at mercy or eternal optimism, prolong the instability that Z.H. and F.H. have experienced in their lives. The Court could not subject them to further uncertain temporary foster

placements in the hope that M.H. will eventually be able to acquire safe and stable housing, provide for their needs, and provide for his own.

It was for these reasons that the Court found that the Agency met its burden by clear and convincing evidence that grounds for involuntary termination of parental rights existed pursuant to 23 Pa. C.S.A. § 2511.

## M.H.'s Compliance and Circumstances

M.H., in his concise statement of errors, claims that the Court terminated his parental rights improperly on grounds that were outside of M.H.'s control. The termination of parental rights may not occur "solely on the basis of environmental factors such as inadequate housing and furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b) "Other considerations."

M.H. was consistently noted as having minimally complied with court-ordered services and having made minimal progress towards alleviating the circumstances that led to placement. These findings were made at seven (7) permanency review hearings since the children were placed into foster care. M.H. had an opportunity to challenge these findings at each hearing, or appeal the Court's Orders, and did not.

24

As discussed above, the circumstances that led to termination of M.H.'s parental rights were within his control. M.H. had begun making progress to alleviate the circumstances that resulted in the original placement when he was complying with all court-ordered services. However, despite all of the services placed in his home, M.H. was unable to keep up with the needs of his children, could not provide a safe and appropriate home, and could not remain consistent with his own treatment. As the record indicates that M.H.'s parental rights were terminated for reasons that were within his control, the Court did not err.

## Parental Bond

In his concise statement of errors, M.H. claims that the Court improperly terminated his parental rights where testimony indicated that he had a close bond with the children and that severing the bond would have a detrimental effect on the minor children. "Attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact." *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 269 (Pa. 2013).

Testimony regarding M.H.'s bond with his children was essentially undisputed. While this bond was strong, the court considered this bond in relation to the best needs of Z.H. and F.H. and determined that the best interests of the

25

children still required the termination of M.H.'s parental rights. As the record supported this finding, the Court did not err.

## Conclusion

At the termination proceeding, M.H. attempted to present this case as one within the confines of § 2511(b); that the Agency sought to separate him from his children due to his poverty. This is simply not the case. The Court found clear and convincing evidence in favor of termination due to M.H.'s reoccurring, prolonged, and irreparable inability to meet the multifaceted needs of his children.

It is for these reasons that this Court's order of termination should be affirmed.

BY THE COURT

_____J.
Michael J. Lucas, Judge

26